Thank you, Mr. Clark. Good morning. Please be seated. First matter this morning involves two cases, consolidated cases 416-0429 and 416-0537 in re Marriage of Croninger. And for the appellant, Mr. Brinkheader. For the appellee, Mr. Bix. Okay, very well. You may proceed. Good morning. May it please the court, counsel, in preparing to prosecute this appeal, I was fairly certain that I would not find any statement or finding by the court that the plaintiff, Mr. Croninger, was guilty of bad faith. And I was also confident that if I was wrong, Mr. Bix would be able to find exactly and point out with precision exactly where I was wrong. In fact, there has been no finding of bad faith by the trial court. In fact, the trial court struggled with this issue and made two separate comments about it in the proceedings in the lower court. One of them is, and I'd like to quote it here because I think it's important, part of this is it probably wasn't bad faith. He's probably just not capable of performing the job or he is not suitable for the job he had. I mean, it is just, it may be that this works out in a small town with a lot of stress and a lot of pressure, a lot less pressure on him, but he lost the job here that he just probably wasn't up to doing. What job are you talking about? The police department in Decatur, Illinois. And as the court will recall from the facts that Mr. Bix presented, there were no less than five different instances in which Mr. Croninger's performance for the Decatur police department was sanctioned by neglect, Why is that relevant for purposes of this particular matter? Well, I wanted to note that the court's comments were based on the evidence Mr. Bix presented, which was that four of the instances of alleged neglect or failure to comply with department regulations and so forth took place before the judgment of dissolution of marriage was entered. That's the only reason I bring it up. So counsel relies heavily on the Armstrong case and the Imlay case. He did so in his bench memorandum. I would point out that in the Armstrong case that the payor, I don't know whether he was a plaintiff or defendant, quit a $90,000 job so he could take a $60,000 position, which he later lost. And the court made a specific finding that Mr. Armstrong did so in bad faith. In the Imlay case, the payor was an outside salesperson. So an outside salesperson, as you know, is a person who gets in his car and drives around and calls up customers. So it's a DUI. Then they say, okay, apparently you work from the office. So instead of servicing his clients by phone, he neglects that and then loses that job. And the court in both cases found that the defendant, or the payor, let's put it that way, was acting in bad faith. I would suggest to the court that the trial court in this case observed that there was, that his loss of employment for the Decatur Police Department where he made $82,000 a year was probably not bad faith. Mr. Bickus filed a bench memorandum. And in the bench memorandum, he points out that the defendant was guilty of bad faith and that he shouldn't be allowed to ask for relief from his child support obligation because he was, because you can't get such relief where you've been guilty of bad faith. Well, the fact of the matter is the trial court explicitly found that it was probably not bad faith. It was just not, he was just not up to the job. So anyway, we have this series of events where the defendant has lost his job and he seeks another job and he is able to find a temporary position and loses that. And then he goes and he finds another job for the Auburn Police Department, which is a small community that makes a lot less money. And he applies, and he presents his motion for modification or to reset support later at that case. And then, let me backtrack just a minute. We have the first ruling where the trial court found that because he resigned his position at the Decatur Police Department, that he could not complain that his petition to modify support would be denied because it was his voluntary action of resigning that was the immediate cause of his loss of that employment. However, the evidence in this case shows that he had a discussion about his continued employment with the chief of police and he was told, and this is not contradicted by any evidence, that by the now-deposed chief of police, that either resign or you're going to be fired. So he didn't just resign out of the blue. He wrote a terse letter and said, I'm going to seek other opportunities and then he went on. Well, counsel, I'm going to come back to my first question. I don't see why any of that is relevant. That case was decided by a court and the case was not appealed. So that's res judicata. We can't do anything about that. So what was he making at the time of the previous order? At the time that he was working for the Decatur Police Department, he was making approximately $82,000. What was he making at the time the court denied his motion? His second motion. The first time. The first time. He was making nothing. Okay. What was he making in this particular matter at the time this court denied his motion to change his obligations? He was making about $33,000. Okay. So he's asking better off than he was when the court made the original decision not to modify his obligations. Right? That's following what the, what is it, the Armstrong case? Isn't that what this court said? The court said, and this was in response to counsel's bench memorandum, that he was barred by res judicata because in Armstrong where the court found that the defendant had quit his previous employment in bad faith that he was barred from seeking a modification of his obligation, maintenance and support. And the point that I'm trying to make there is that the MLA and Armstrong and the bench memorandum filed by counsel all were based upon two cases where bad faith was the kingpin of the court's prior denial or subsequent denial of the modification request. So now the guy is ordered by the court to go look for a job and he goes and he finds a job and he comes before the court again and now instead of making zero he's making $33,000 and the court denies his second petition because counsel suggested that he was barred by res judicata. And the effect of the ruling is that he never will be able because of this supposed non-existent bad faith finding in the first proceeding to modify support and maintenance that he's barred from ever seeking a modification. The third point raised in the second is hypothetically what if he were to lose his job again? He'd be making nothing. He goes back to court and now before the court is a situation where he went from $32,000 down to zero. So now the court might say, yeah, that's a substantial change in circumstances. So what I'm getting at is when you say he can never ever have it reduced, that does not seem to me to be an accurate statement. If the basis for not being able to seek a reduction in maintenance or support is Armstrong and Armstrong was based on finding a bad faith by the trial court that he can never come back into another court of law and present that he's a bad faith person. That he's making less money because the original adjudication of bad faith blocks him from ever asking for relief in the future. And I've searched diligently through counsel's third issue as to what circumstances somebody might be able to present that they are entitled to some kind of relief. And it's not there. It's just not there. There's no criteria. Once you have been found guilty of bad faith, restitution kind of bars you from ever coming before the court unless you've had an increase of income from your original. Well, how about the hypothetical? So he calls me and I say, forget it. We're not entitled to anything. This is up before the court. So he went back to work last week. So I don't know what the guy will ever do to get this changed except to go look. Do exactly what the court told him to do. Go find a job. Get a job. Come before the court and say, okay, judge, can you base my support on what I make? And this is what he did. And the adverse decision to that petition is what we are here about today. So I would like to just say one thing. And that is that I think it is the law that when we were talking about the benchmark of the test of a decision is making good faith is whether the change was prompted. And that is exactly what we have here. We have circumstances. I mean, the guy just was not suited for the job. He had quit the job because he did one mess up after the next. And ended up having to face off with the chief of police. And the chief of police said, you're going to get fired or you want to resign. So he resigned under fire. And so now we are seeking to have his child support reset. And I was very put off by counsel's previous argument before the trial court that this is comparable to a situation where a guy has a big job and he quits the job, goes to McDonald's, goes to work at McDonald's and they say, no, you can't do that. And then comes back a year later or a month later or six months later and asks for another reset on child support and res judicata would obviously be a bar to him relitigating where the court had barred him because of bad faith. But this is not bad faith. And that's the problem. The linchpin of those two cases is the finding by the trial court of bad faith. We have exactly the opposite here. I thank the court for its consideration. Thank you very much. You'll have rebuttal. You may please proceed. Court, please. Counsel. Good morning. My name is Kurt Bickus and I represent Appley Mariel Kroeninger. During the course of any litigation, a party in consultation with his or her counsel needs to make a number of important decisions. The decision whether or not to appeal, an unfavorable result in the trial court, however, is one of the most important decisions that a party makes. And it's the most important decision a party makes because it has consequences and sometimes those consequences can be long term. As it relates to this case, in August 2015, the trial court denied Mr. Kroeninger's first petition to modify maintenance and child support. And that was a ruling, obviously, that Mr. Kroeninger deems unfavorable to him. Mr. Kroeninger, however, chose not to appeal. And we all know that if a party, for whatever reason, chooses not to appeal an unfavorable ruling, that party is then bound by the ruling and later cannot attempt to relitigate the matter, no matter how unfair he thinks it is. In this case, in May of 2016, when the court heard Mr. Kroeninger's second petition that he filed in November of 2015, Mr. Kroeninger was improperly attempting to relitigate the August 2015 proceedings. And that's what he's done throughout this whole appeal, frankly. The August 2015 order, as the court knows, was the ruling where the trial court held that Mr. Kroeninger's loss of income because of his resignation from the Decatur Police Department was not fortuitous, but rather the result of his own deliberate conduct, knowing conduct. Upon his decision then not to appeal that ruling and accepted it, the doctrine of res judicata barred him from seeking another reduction based upon the same facts, including the loss of the Decatur Police Department income. In our brief, we set forth the three elements that are required for res judicata. A final adjudication of the merits, that was the August 2015 ruling. Identity of cause of action, a single set of opposite facts in the same parties. I would suggest that all three elements exist here and that this is a matter of res judicata. Mr. Kroeninger generally denies the characterization that he's trying to relitigate the first petition for modification of maintenance and child support. But if the court will look, it's throughout this whole process. If you look at his second petition to modify, which was the one filed in November of 15, and look at paragraph 2, he alleges that his income is substantially different than it was when he was formerly employed as a police officer. And then, I know the court has read the briefs, and I hope you've noted that eight out of the nine pages in the Statement of Facts are dedicated to complaining about the trial court proceedings in August of 2015 and the 2015 order. Then, if you look at the argument, there appears to be 31 separate paragraphs. Nineteen of those paragraphs appear to be exclusively focused on the August 2015 proceedings or the August 2015 order. And that's just the paragraphs that are exclusively devoted to the August 2015 proceeding. There are other paragraphs where it's touched upon. If you look at the first page of the brief, the nature of the action, here's what the brief says. This is a post-judgment matter where plaintiff asked the trial court to modify maintenance and child support because his income had been reduced. That statement doesn't describe the second petition to modify maintenance and child support. It describes the first one. So, in our opinion, this is just a blatant attempt to re-litigate, improperly re-litigate the August 2015 proceedings. And if you look at the brief as a whole and counsel's argument, there's little, if any, attempt here made to show, explain, or demonstrate how there was a substantial material change of circumstances after August 2015 that would justify a reduction. So, do you agree with Mr. Brinkheader that there's really no way he can ever come back into court and get his child support modified? No, I do not. If you look at Armstrong, I think it's one of the last paragraphs, the court says, While future adjustments of support are not precluded under these circumstances, they cannot automatically be based upon a reduction in, it says, David's, Papa John's pizza salary. What happened in Armstrong is Mr. Armstrong had a job at Papa John's. He was making $90,000 a year. He quit. He went and got another job. He was making $60,000 a year. The court denied his first petition to modify support. Then some time goes by and he then gets involuntarily terminated and files a second petition. By the time of the hearing of the second petition, he's making $66,000. And the trial court denied that second petition. Of course, it was appealed and the denial of the second petition was affirmed. The reason that that happened is that Mr. Armstrong, like Mr. Kroeninger, was attempting to re-litigate the matter, the denial of the first petition. And I agree with Justice Turner that if, for example, Mr. Kroeninger gets hurt so that he can no longer perform the duties of a police officer, or let's say due to budgetary restrictions he's laid off, he's free to come in and file a petition to modify support. We've never claimed that he can't do that. Any petition would have to fall within the established parameters. For example, the change of employment has to be made in good faith. It can't be motivated by a desire to evade financial responsibilities. It can't be, or the change has to be fortuitous and it can't be a result of his deliberate conduct. But yes, I disagree with Mr. Brinkhouder that he can't ever come back and ask for a modification. I think that's clear. And Armstrong says it. I hope that answered your question. What's going on here is that Mr. Kroeninger is using the wrong benchmark. And the issue on a petition for modification of support is whether there's been a material and substantial change in circumstances of the parties since the previous order. Mr. Kroeninger's approach is that the previous order is the original order from November of 2014, but that's not the previous order. The previous order is the denial of the first petition to modify child support in August of 2015. That's the previous order that the cases talk about. What counsel is doing is he's comparing November of 2014 with May of 2016. He ought to be comparing August of 2015 with May of 2016. And the court is correct that in August of 2015, after the hearing of the first petition, Mr. Kroeninger's income was zero. And at the hearing on the second petition to modify, his income, I believe it was $37,000 instead of $32,000. But he substantially improved his circumstances, and it's clear that there was not a material and substantial adverse change of circumstances. We, of course, believe that the 2004 Fourth District case of Armstrong is dispositive of this appeal. And I know this court is familiar with Armstrong, and so I just want to make just a couple comments on that case. Mr. Kroeninger here is arguing that Armstrong is distinguishable because Armstrong found that the father's decision to quit Papa John's Pizza and go to Pizza Maggia was in bad faith. Then he's trying to argue that in this case there was never a finding of bad faith, so Armstrong must not apply. But Mr. Kroeninger is missing the point. The point in Armstrong is not some issue about bad faith. The point in Armstrong is that when your first petition is denied, you cannot base your second petition on the fact that you used to make $90,000 at Papa John's, and now you only make $66,000 at Quality Dining. The proper benchmark is the $60,000 that you were making at Pizza Maggia at the last hearing where your first petition was denied. And in Armstrong, they had a situation where after the first petition was denied, he was making $60,000. And at the hearing on the second petition, he was making $66,000. And that's the same fact pattern we have here, but it's the same fact pattern on steroids. Here, Mr. Kroeninger's income was zero at the end of the first petition for modification, and at the hearing on the second petition it was $37,000. Well, counsel, would you agree that Mr. Kroeninger's maintenance and child support obligations are based upon an $82,000 salary when he's really only making about $32,000? Yes, but... Is that fair? Yes. Why? Well... It's a matter of equity that doesn't quite ring a bell to me as being very fair. There's an old Latin legal maxim that says, dura lex, sed lex. I don't know if I'm pronouncing that right. But it says, the law may be harsh, but it's the law. And if we are correct on the law here with respect to modification of the support, the entitlement to it, and the res judicata aspect of this, it doesn't matter whether the result is harsh. And I know sometimes as a court, it may be unpleasant to affirm something that you might consider to be harsh, but that's not the case. That's the law. Well, as a practical matter, how is he going to pay it? Well, what the trial court did here is actually fashion a remedy for him that allowed him... He wouldn't pay so much a month on your rearage? Yes. And that was actually a creative way to do it. It was a way that we believe is justified by the law and allowed him to live and maintain himself and pay at least something. With respect to this harshness argument, the other thing I want to tell you is that Mr. Kroeninger is not the victim here. My client and the children of the parties are the victim here. He brought this on himself. And either way, there's going to be a harsh result. If the court affirms... If this court affirms the trial court, Mr. Kroeninger will view the result as harsh. But if this court reverses the trial court, that is going to be a harsh result on my client and the children of the parties. And so it's going to be harsh either way here because of what he did. And from our perspective, if we're going to have to allocate some harshness, the court ought to allocate it towards him instead of my client. I hope that answered your question. Counsel did not touch on the appeal with respect to the prospective attorney fees. So if I may just briefly, I'd first like to apologize for something. In my brief, I indicated on page 32 that Mr. Kroeninger was present at the June 21, 2016 hearing. And in preparing for this argument today, I realized he was not present, so I apologize for that. But with that said, however, there was no objection to the amount of the fees. And the court had before it and considered evidence of the financial resources of both parties. And as this court knows, the law affords the trial court wide discretion in this area. And we believe that the trial court acted certainly within its discretion. In exercising its discretion, the court had before it evidence of a $1,200 per month income disparity between the parties. The evidence was clear. My client had no money. She had no savings. She had no retirement. She had nothing to sell. She had a mother, or has a mother, that was helping her pay $950 towards her rent, but her mother couldn't help anymore. The evidence was that Mr. Kroeninger had damaged her credit to the point where she couldn't even borrow any money. And it had been a year of no child support and no maintenance, which deprived my client of more than $23,000 in support. There was a $1,500 garnishment that we obtained and a $300 payment shortly before the hearing. But other than that, there was nothing, even though he had the resources to do something. That's evidenced by the finding of contempt. You might have seen that in the May 6, 2016 order, the one that's being appealed, the trial court referred to the financial circumstances of my client and the children as dire. We believe that it was Mr. Kroeninger's conduct that created my client's inability to pay. Then the court heard evidence about $10,000 bank accounts. The original judgment required that this money be evenly divided, and the court heard evidence that Mr. Kroeninger never paid this. He later said, I think it was in August of 2015, that he never had the money in the first place. But he listed it on his financial affidavit the day of trial, the statement of position on the day of trial, and in his final arguments two days later. Then he filed a post-trial motion after the original trial, and he never raised the fact that he didn't have this money. Then the court heard evidence of Mr. Kroeninger's failure to divide the Navy Federal Credit Union. That was the IRA that was $31,000, and he received the first $6,500, and they were to divide the balance. That would have been $12,000 that my client could have used to help pay for her appeal. And the evidence was that all he had to do was sign a couple pieces of paper on a letter of direction and send it to the credit union, and over a year and a half he never did that. So it would have helped that he just complied with the order, and that might have made a difference and would have been funds that my client could have used to help pay for her appeal. And it would have also generated $18,000 to $19,000 to him that he could use if he wanted to. So the truth of the matter with respect to the fees is that the court heard the evidence, had evidence before it, has a wide discretion, and exercised that discretion with the evidence before it. And the truth of the matter is that Mr. Kroeninger's actions or inactions drove my client into effective poverty, and he had assets available to him. Then we also cited in our brief some other cases that indicate that this court is also able to consider whose actions it were that initiated the invocation of judicial proceedings, and we would suggest that that was Mr. Kroeninger that caused the need for the proceedings in the first place. I see my time is not up, but I don't know if the court has any questions. But if not, we would simply ask the court to uphold the trial court's discretion in these matters and affirm both the denial of the second petition to modify and affirm the award of prospective attorney fees to defend this opinion. Thank you. Thank you, Mr. Bickus. Is there any rebuttal? At the beginning of his argument, counsel criticizes my client for not appealing, and now at the end of the argument he complains that my client has appealed. I don't know what we're supposed to do. I would ask the court to consider that until just recently, the parties paid their own way in the appellate courts. Sure, my client has problems, financial problems also. If you look at their recitation of the facts, you see that my client has had to borrow money to maintain mortgage payments and has in fact borrowed thousands and thousands of dollars from his parents. So that's the only reason the house isn't in foreclosure, is all I have to say. Okay, thanks to both of you. The case is submitted and the court stands at recess. Thank you.